I please the court Maddy Dworkman for petitioner Alex Francois. The stakes in this case are high. For my client whose mental decompensation has reached the point that he has been civilly committed, deportation to Haiti would be a death sentence. But Mr. Francois does not just prevail on the equities in this case. He wins on the law. The legal and factual errors discussed in the briefs are the board's decision below cannot stand. But the key question for this court is were Mr. Francois removal proceedings fundamentally fair as due process requires? And as we consider this question I want us to keep in mind the issues in this case that are undisputed. It is undisputed that Mr. Francois suffers from severe mental illness including schizophrenia, bipolar disorder and psychosis, all of which manifest in bizarre and erratic behavior. He was found to be incompetent in his proceedings. The government stipulated to Mr. Francois particular social group as well as the absence of any bars to the mandatory relief he seeks. The government concedes in its brief that this case is governed by several judicially established facts. Mr. Francois will be detained upon removal to Haiti. He will be treated as a criminal deportee. He will not receive adequate treatment for his mental illness. Conditions in Haitian prisons are deplorable and Haitian authorities subject detainees to extreme repressive measures. What is the what is the factual record specific to Mr. Francois in terms of his likelihood of future facing? Sure so it is undisputed like I said that he suffers from a severe mental illness that his severe mental illness manifests in very bizarre behaviors, aggression, self-talk, psychotic episodes, he's eating grass, drinking urine and I would you know at this point in time they become even more bizarre and he was excused from testifying at his removal proceedings. In the record there is a very lengthy detailed expert report that lays out its eight sections talking about risk to criminal deportees. Risk to people . . . To Mr. Francois specifically I mean I remember I was on the motions panel that denied the motion to stay removal pending appeal. Right. And what I recall is that there was there was a mountain I guess of country conditions evidence so to speak. General things about Haiti, general things about mentally ill in Haiti, general things about incarceration in Haiti but what seemed to be lacking and I think this is why the VA remanded to the IJ for further findings were things specific to Mr. Francois and of course what we're looking at is not do we allow asylum or withholding of removal or Convention Against Torture Relief to a class of people. We've got to look at the individual. So what is the evidence about the individual's risk of future persecution? So I think we have to look at the judicially established facts of this case. So Mr. Francois's individual circumstances, the fact that he has a severe mental illness, the fact that it manifests in bizarre ways. I mean it is uncontested that he will be detained upon arrival. That's because of his criminal record not because of his mental illness. Right but his claim I think we need to keep in mind what his central claim is in this case. He's not saying I am going to be detained in He's not saying I'm not going to receive adequate medication because of my mental illness. He's saying when these things occur and it is agreed that they will occur, he's saying I am going to be individually targeted with these extreme repressive measures that Haitian authorities use against people with mental illness because it's viewed as Montfau in Haitian society. And so this case really turns on the extreme repressive measures and those are the very things that, you know, the first time around we know the immigration judge found in Mr. Francois's favor. It went up on review. We have a, you know, we have an uncontested record and, you know, very specific facts. In the second hearing before the IJ there was no new evidence presented on behalf of Mr. Francois or was there? There was no new evidence presented and I would submit, I mean that was appropriate. We had an immigration judge who found that it was more likely than not that he's going to be persecuted on account of his mental illness and we have a BIA opinion that says the immigration judge didn't find those very things, but if you look at the immigration, the first immigration judge decision in April 2019, the immigration judge found that he's more likely than not to be persecuted and that it's going to be a count on his mental illness and those are . . . We're talking about the substantial evidence standard of review. So the evidence has to compel the opposite conclusion. We've got a situation . . . Look, it's an excruciating case. I remember very well when the motion for a stay of removal came through. It's an excruciating case, but having said that, you've got an IJ that found one way and then an IJ found the other way, but that's a fact-finding kind of thing and clearly there are records that we would affirm on under the compelled and substantial evidence standard that could go either way. Literally, here we have a case that went both ways, I guess, at one point in the proceedings or the other. So how are we to reverse on this matter given our standard of review? I think there's two things here, Your Honor. I think we have to look back and say how is it that it was reversed the first time because the BIA's regs say that the BIA can remand a case where further factual finding is needed, but this is a record that never changed and these were factual findings. It never changed after they sent it back. I mean, that wasn't within the BIA's control. Right, but the record was . . . I think two things. The record was complete and the immigration judge's initial decision was complete and the findings that were allegedly missing, right, if you look at this decision, they weren't and they were factual findings that the board was required to look at under a clear error standard of review. So we now . . . Was there a motion to reconsider before the BIA at that juncture? There was not. Was there any sort of way that this was raised before the BIA at that juncture? I don't think it could have been. Was it raised on the second trip up once the IJ had reversed itself, I guess? It was not and I think for a couple of different reasons, right. I mean, the second appeal was an appeal from the second immigration judge decision to the extent that he could have asked the board to sua sponte reconsider its first decision. I mean, that's an ask to reconsider. It's not a remedy available as of right and we know under Santo Zachariah that he wasn't required to raise that. Well, but couldn't it have been raised before the BIA just in the normal appeal process? We're talking about the second trip. The IJ disregarded this finding it made before and this finding it made before and this finding in the record and the BIA did as well and now you've got to look at those things. Was that argument made? I mean, he certainly argued the second time around that the immigration judge arbitrarily reversed his findings on the same record and misread the very evidence that he had relied on to grant relief to deny relief. As you can see, there's a lot of discussion here. We have an expert report that clearly concludes he was more likely than not going to be persecuted and tortured in Haiti and we have an immigration judge and a board of immigration appeals saying the expert report never gets there when it plainly does. So, this remand resulted in the evidence being distorted. The evidence is mischaracterized the second time around. His legal arguments are or not to get my medication because of my mental illness. What's your best case or cases for circumstance say where is here? There is all this evidence, you know, I'm just trying to speak about his psychiatric status but where as you've been asked if there's nothing specific targeted at him but a mountain of other stuff, what's your best case or cases that sort of inform granting the petition here in the face of the record itself? Sure. So, I think two things, right? One, right, I really think, you know, even though Mr. Francois prevails under the substantial evidence standard of review and I'm going to note a couple of cases in a minute, that this standard of review question is really critical because if we have a mountain of evidence and agency decision makers saying this evidence could be read in your favor, we go back to the question of how did we ever get to a redo with a remand the first time around because the standard of review has now been flipped. And, you know, how is that fair? The same standard of review should  be followed. Yeah, but what I'm trying to get to here, we take the case as we find them. You know, as we find this one, there's not, you know, wanting for evidence, two trips back, you know, the IJ, the BIA, we don't know why the BIA did what they did, maybe they didn't like the results, says do over. I mean, that's not it, but taking that, what case or cases, you know, help us in terms of fitting this scenario into something that grants or not versus the more, you know, substantial evidence, boom, denial. Sure. So, I mean, there's a lot of cases about you know, Haitian deportees, there's a lot of cases, you know, with applicants who had mental illnesses. And I think, you know, if we look at the cases that, just the cases that the board and the IJ relied on to dispose of Mr. Francois' claim, you know, Enrique J. E says, you know, Haitian prison conditions taken alone don't rise to the level of torture. And we know torture is a higher threshold than persecution, which is why I'm looking there. And in, you know, in that case, the board itself tells us where we draw the line. They say the prison conditions alone don't get there, but you have deliberate acts that occur inside Haitian prisons, like hooding, choking, burning with cigarettes, calat morasa, etc., that can rise to the level of torture. And the board said, we're not saying that every applicant that complains of, you know, that is a criminal deportee loses their case. If there are certain characteristics that that person has, they can still prevail under CAP, and I would submit also withholding of removal. The second case that the board and the IJ misapplied is matter of JFF. That's a case . . . Matter of . . . Matter of JFF. And that's a case where an immigration judge suggested to the applicant, you know, a possibility of relief, coaxed unreliable testimony from that applicant about his mental illness, the availability of medication in the Dominican Republic, how he would act without his medication. And the only other evidence in that case was a single State Department report. And there was only one sentence in the State Department report that were on it, and it said, you know, this is not enough evidence. The judge can't just string together a set of hypothetical suppositions to, you know, get to an immigration benefit. But what we have here . . . I mean, we have a wildly different evidentiary record in this case. I know, and I know you want to stay with the facts and the evidence, but as you well know, we're not finding facts. We're stuck with whatever the facts are. I'm just trying . . . you talked about two cases where they've been lied. I'm just trying to get you to identify, I mean, what's . . . I think the . . . You know, the legal . . . the cases that we're going to need to dig deeper into. I mean, we'll dig in the record. I mean, the facts are what they are, but help me at least understand how you can get there. So, I think the misapplication of word precedent, right, is a legal question, one. Two, I mean, there's lots of other legal errors that this Court should look at in this case de novo, right? We have a question of whether or not, you know, the CAT regulations say you need to look at all evidence of future torture, and the Board in every circuit to have considered that has said that has to be an aggregation analysis. And if you look at these decisions, the multiple torture theories are looked at separately, and there is no aggregation. So, you know, that's a de novo standard, and I think it's the same thing with specific intent. The question of whether or not, you know, a specific set of facts meets a legal standard is a question of law that this Court should look at de novo, and that Mr. Francois asked the Board to consider de novo. So I don't think we're in a situation where, you know, if this Court doesn't, you know, go with us on the due process claim, and I really urge you to think about that because I think that the scope of review extends not just to the November 2020 Board decision, but we have to go back to that September 2019 decision. INS V. Chadha said, you look at everything on which the final order is contingent, and in this case, you know, the 2020 Board decision is plainly contingent on that 2019 remand decision. Otherwise, the standard of review would be flipped. My client would have been in a very different position and would have the relief that was granted by the IJ back in April 2019. And to say that decision is unreviewable would mean that the BIA can send any case it wants back down for a do-over and further fact-finding as many times as it wants, and there's no pathway to federal court review. And I think that just can't be the case. Thank you. Thank you. We reserve time for rebuttal. We'll hear from the Governor, Ms. Gleiser. Good morning, Your Honors. May it please the Court, my name is Sherry Gleiser, and I'm appearing on behalf of the United States Attorney General. As Judge Wilson mentioned, factually this case is excruciating. It's a very difficult case and the government can't contend that, but Mr. Francois simply does not meet his legal burden for withholding of removal or cap protection. I guess if he doesn't meet the burden, who does? Someone who submits sufficient evidence to show that, you know, the . . . Like what's missing here? Nexus for withholding with regards to the treatment in a detention facility. But isn't it enough to say . . . I mean, the disputes that. He's going to go to jail when he goes to Haiti because of his criminal background, right? And in jail, this is what happens to folks with severe mental illness. It's almost . . . I mean, is it almost presumed that at some point he's going to exhibit outward symptoms that identifies him and that then therefore singles him out for targeting? I mean, is that not enough to say? No, I would argue it's not. Relief is warranted? No, I . . . the government would argue, as I did in the brief, that with regards to Nexus, there is no evidence that the official's actual motive would be to harm him because of his mental illness. And the record is replete with evidence showing just how inadequate the prison system is, how inadequate health care is, the mental health facilities. And we have . . . there's two mental health facilities in Haiti and we have statements from a doctor in one. He specifically says, this is 625 of the record, that the doctors have the desire and the ability to humanely treat individuals with mental illness, but the government simply doesn't give them the means to. And with regards to the second . . . They can't treat it because the government . . . they can't treat it. And so therefore, what's happening in the prisons, is there any evidence in the record that refutes the condition of the doctor? I'm not . . . I'm not sure I understand your question. Well, I mean, so you just . . . you just read an aspirational statement from a doctor in Haiti and says, we would love to treat them, but we can't because the government doesn't give us resources. We can't do it. Correct. So, in contradistinction, in prisons, there's evidence that shows how they're treated, not by doctors, but by the prison officials, by the government, right? So, if that rises to the level of torture or persecution because of his protected social group, isn't that the nexus? I would argue, with regards to treatment in detention centers, that we also have evidence that it's . . . that is not the nexus. And actually, a lot of the evidence is in the expert report, specifically the expert on page 542, after talking about the repressive measures some of the police uses against individuals with mental illness. She emphasizes that there's no psychologist or psychiatrist that's employed by the police how to properly address an individual with mental illness. And on page 5 . . . Why isn't his individual circumstances, in this general middle view of evidence, he's what, 60-something years old? I believe so. You know, 60-something years old. I mean, this is chronic. It's not going to change. Nobody . . . the government doesn't dispute the PSG. Nobody disputes, you know, it's just, you know, over the top. It's so bad, he couldn't testify at his own proceeding, so he can't testify to add whatever the other specific might be. So, why does his . . . his mental status cut against him in terms of the likelihood of it being singled out, you know, when he gets there? Age and the rest of it. I mean, just like the question of cheapest, it just . . . even the IJ initially. I mean, how would one otherwise prove the level of specificity being urged here? You know, it's like having a case where the only way you could prove it is somebody confessed. You know, I'm just . . . it's not that we're finding facts, but there's so much the government doesn't dispute in terms of his individual situation, his age, he goes back, can't be treated, whatever. His behavior seems to be so untoward that just his mere presence and exhibiting all that is just gonna manifest in him being singled out. Well, I . . . with regards to Catt, actually the agency found the opposite, that he did not show the requisite likelihood for torture, and the agency did not address that for withholding, but did address the nexus that even, you know, assuming he is, again, exposed to this treatment, that the nexus just isn't there. When we look at the record as a whole, the record does not compel that conclusion, and another statement I was going to point to by the expert was that he'll be at risk in detention of certain brutality and abuse, but it's due to, quote, an absence of a structure to address the individuals with mental illness. Well, in a follow-up to what Judge Wilson asked, you said what's missing, but state how one would establish the nexus. We would have to have evidence showing that Mr. Francois's mental illness, not a completely inadequate system, would be the motivation for individuals to harm him, and we just don't have that evidence. Is my memory right that when the BIA remanded it for the first time to the IJ for further fact findings, that that was the problem? It wasn't the general evidence, the country conditions, and all that systemic stuff. It was how is this connected to Mr. Francois? My interpretation of the remand was that the IJ's decision was very conclusory, and the fact finding was not in that first IJ decision, and the Board cited in Attorney General decision saying that it actually, it's on the first page of the, I believe the first page of the Board's decision, that the Board has this opportunity for the IJ to engage in fact finding, so that if the case comes back to the Board, the Board can properly . . . I'm remembering more specificity maybe than what you're saying. In other words, it was a general remand to say flesh out this record. It was a general remand to say flesh out this record. I'm sorry. Yes, that's the way I understood it, and with regards to the due process argument, if I could just address that for a second. That is one of the arguments that the government contends Mr. Francois failed to exhaust, and on remand, the IJ held a hearing on, I believe it was October 23rd, 2019, and asked both parties how they interpreted the Board's decision, and both parties said, we interpreted that you look at this record and engage in the fact finding that the Board placed in its decision, and neither party wanted to submit any additional arguments, and in his brief, Mr. Francois makes the argument that the Board sent the case back for fact finding, that the Board was somehow trying to impose a view on the IJ to get the IJ to reverse the decision, but all of that could have been presented to the immigration judge. Mr. Francois' counsel could have presented all that, could have asked to submit briefing to say, hey, we think the Board sent it back for findings that were already found, and then the IJ could have addressed that, and if Mr. Francois was unhappy with the way it was addressed, that could have been on appeal to the Board, and then we would have something to look at, but it just wasn't exhausted, and to the extent that Mr. Francois says that the earlier Board decision somehow should be in front of this Court, it can't be. It wasn't a final order of removal, but had those arguments been presented to the IJ, and then some argument presented to the Board, and the decision, one of the decisions that's in front of this Court, it would have been exhausted, but it simply wasn't. And it's . . . So this isn't a Santos-Zecaria exhaustion issue. This is just a flat out, you didn't raise it before the BIA when you came back here for the second time. Yeah. Absolutely. I actually think, looking back at this case, that, you know, Mr. Francois sort of argues that he was no longer required to file a motion to reconsider, and the Government doesn't agree with that. When the Board issued its dismissal, Santos wasn't issued, but I do think there are six main arguments that he never presented to the Board, and that he could have, and that's any argument regarding mixed motive, this due process argument, any argument regarding competency, because on that hearing before the IJ on remand, both parties agreed that competency, removability, and asylum, they were resolved. There was nothing more to do on those issues. This aggregation issue in CAT that the agency ignored acquiescence, and a specific intent argument that he makes that the agency erred in looking at the subjective intent of torturers, that it should have just said this is so inhumane that there has to be specific intent, that those six arguments could have absolutely been presented to the Board, you know, the Board just looked at the IJ's facts finding, found no clear error, and found that it agreed with the legal conclusions, and all of these arguments could have been presented to the Board, and just none of them were. So even assuming that he, for some reason, was not required to file a motion to reconsider, the result here with regards to those arguments, it would be the same, because they could have been presented to the Board in some form, and they just never were. Actually, in this scenario, this is clarifying, because I was thinking, we've been thinking a lot about Zanta's Zachariah lately, but a motion for reconsideration may not have even been well taken, because if the issues weren't raised primarily, then there's no way, I mean, they wouldn't have been exhausted from the get-go. Exactly. I think, you know, if they had been somehow in some motion, I mean, it just, they could have been presented to the Board, so a motion to reconsider was not a proper avenue for them. So does this become a substantial evidence case? Yeah. Absolutely. I think the whole case is substantial evidence, and, you know, under Arkansas v. Oklahoma, the Supreme Court cautioned that court should not supplant agencies' findings with alternative findings that could have been supported by substantial evidence. It's looking at the agency's findings here, and whether these are supported by substantial evidence, and that's the Court's job, and looking at the entirety of the record, the government contends that all of the agency's findings were supported by substantial evidence, even if maybe there's a statement here or a statement there that might be a little different, the record as a whole has to be looked at, and that all of the findings here are, in fact, supported by substantial evidence. The record does not compel a contrary conclusion, given all of the evidence that we have, and all the evidence that the agency relied on. Where is he now? Where is Mr. Francois now? He, well, he was released from detention on, let's see, March 10th, 2021. I received an email from counsel on Friday, honestly, I didn't really get to read it because of everything going on with the shutdown and preparing for argument. I believe he's confined again, if that's correct, but I don't, I didn't get to read through it, so I'm not quite sure that, to be honest. That's all I have, unless your Honors have any more questions. All right. Thank you. Thank you. All right. Rebuttal. So, if you'd like, I can quickly clarify the answer to your prior question. So, Mr. Francois has been in a carceral setting for the past two years, persistently incompetent. On September 15th, he was civilly committed. So, he's presently in protective custody in Bell County Jail awaiting civil commitment. He was committed, or he's . . . Yes. The civil commitment order was entered on September 15th, and it's just a matter of timing in terms of his transfer to a facility. The civil commitment is 12 months with a possibility of extension. So, how does whatever we do here affect any of that, if at all? Well, I think . . . I mean, the removal order is still hanging over his head, despite the fact that he has been found completely unable to care for himself. He has been acutely psychotic. He went for six months of inpatient treatment from November 2022 to May 2023, and was still incompetent at the end of that inpatient treatment on, you know, a very heavy regime of antipsychotic meds. So, the mental decompensation since the time these proceedings, you know, took place before the IJ has been very substantial. I'm not even sure how the government would effectuate a removal. I have tried to resolve this case through multiple requests for prosecutorial discretion, and they have been summarily denied, which is why we're here asking this court, you know, to look at this case. Okay. Well, I took away some of your time. I've just . . . Yes. I wanted to know where he was, so I don't want to diminish the time you have to, you know, respond to the government. Yes. On exhaustion, Santo Zachariah applies to this case. It applies to some of the claims, but it doesn't apply to claims that could have been raised in the primary appeal from the IJ to the BIA second route, second trip. Yes, but I will say, aside from the due process claim concerning . . . Oh, but the due process claim . . . It's not a legal error, you know, that the board committed. So, any error that the board committed the second time around no longer needs to be raised in the trial. Right. Right. But counsel opposite, I mean, she actually explained it better than I was trying to ask you earlier, that a number of these arguments could have been raised before the BIA on the second visit there. In other words, that they disregarded when they remanded some fact findings that the IJ had made, that they sort of misread the case, misapplied the standard of review. All those things, all those claims were extant when you went to the BIA for the second time, so they're not exhausted if they weren't made. They were raised. So that, I mean, my response is . . . I thought counsel opposite said they were not raised. I mean, he complained about the, you know, misconstruction of the evidence, the misapplication of the legal arguments, the failure to aggregate torture. All of those claims were raised at the BIA. I think the only, you know, claim that there's really any debate, well, the government has said something else today, but that this court really needs to consider is that due process claim arising from the first decision because the other claims were raised at the court. The due process claim you're talking about, the remand. Yes. How is it a due process violation to send it back for further process? Well, it has to do with the consistent application of agency regulations. There can't be one standard of review that . . . But are we going to litigate every time the BIA wants to remand for further fact-finding? We get those requests all the time, even when the case is here on appeal, to dismiss the appeal and let it go back and let them send it back to the IJ. I mean, are we going to litigate whether they followed their procedures each time they do that? I think there needs to be a need for further fact-finding, right? There has to be some principled limitation on the BIA's ability to send a case back for further fact-finding, or else it can send it back for no reason at all. I do want to touch on nexus. The government talked about nexus being missing for the withholding claim. Madam Clerk, give her two minutes extra. I took a minute and a half asking about Mr. Francois's status, so give her two minutes on the clock. You got two minutes to exhaust, no pun intended, whatever your rebuttal was going to be before I took you astray. Thank you, Your Honor. I want to say a couple things about nexus. The government has said we need to look. There's all this evidence about poor prison conditions in Haiti. There's all this evidence about lack of training. That just doesn't answer the question. The question here is when he is beaten with metal rods, when he is locked in a crawlspace under the stairs, when he is ear-boxing torture technique, what is the motivation for those harms going to be? Even the board the second time around says the evidence of the mistreatment of mentally ill in Haitian prisons is extensive, which is near a concession that the nexus element is there for withholding. Well, but this isn't a case in one of our three states challenging the adequacy of the mental health system in Louisiana or Mississippi or Texas. This isn't a case where we would even have the power to remedy the prison system in Haiti and abuses and things like that under our American standards of law, right? This is a case as to whether this particular man will be targeted by the government because of his membership in this protected social group without all this other stuff just happening. In other words, we can't remedy the systemic things that are amply supported in the evidence. The only thing we're looking at is what happens to this person. I completely agree, right? But, I mean, this is a classic mixed motive type. But you concede your case is built on the supposition that these things will happen, but again, well. It's agreed that they will here, right? I mean, I think we can really boil this down. But is that nexus under immigration law? I mean, the only reason that he would be beaten to overcome his erratic behavior would be his mental illness. And I'm out of time, but I mentioned there's no nexus for CAT. Thank you. All right. Thank you to both counsel. It's an interesting case, to put it mildly.